Good morning, Your Honors. My name is Christy Shuto, and I represent the petitioner Bao Tai Nian. May it please the Court, we ask the Court to follow the 2nd, 3rd, 7th, and 11th Circuits and maintain jurisdiction over asylum-only proceedings here in the context of a crewman case. Because the denial of asylum in conjunction with referral to an immigration judge is so closely tied to removal, we ask that the Court elevate substance over form and equate the final agency disposition of the case with a final order of removal. We also ask that the Court hold that the BIA's negative credibility determination in this case is not supported by substantial evidence. The sole basis of the negative credibility determination that the BIA made is the discrepancy between petitioner's testimony and the date on a sterilization notice that the petitioner received in China. We submit that this discrepancy is collateral and does not go to the heart of petitioner's claim. Also, petitioner repeatedly gave a plausible explanation for the discrepancy, that he did not remember the exact year that he received the notice because it had happened a long time ago. He was off by, what, 10 years? Yeah, it was close to that, but he did say he couldn't remember, and the immigration judge, who was questioning him, asked him to see if he could remember. And he didn't remember that he had fled to the island because of getting the notice? Well, I think he had. But he had fled 10 years before the notice came? He didn't recall that either?  We would submit that the heart of petitioner's claim to pass persecution under China's coercive one-child policy is the fact that his wife was forced to have an abortion and that petitioner subsequently moved his family to a small island in order to have his second and third children in violation of the policy. Now, he gave his disparate testimony and then decided he couldn't remember when he was challenged with it, right? No, I actually believe he stated he could not remember right off the bat. If you look at the administrative record, he said he couldn't remember. And you're saying the BIA had to accept that? He's off by 10 years. His whole claim really revolves to a large extent around that problem and his having to escape to the island and try to protect himself, and yet they found him on the island finally, et cetera. So it revolved around that more or less, no? And yet he just couldn't remember those dates. And the agencies were required to accept that, and not to have done so is something that no rational fact-finder could have done, correct? I think I disagree with that. Sure. Our position is that the petitioner had a very good reason for not being able to remember exactly when the notice came to him. I'll also point out that he was not at home when the government official came to deliver the notice. It was given to his aunt, so that may not be an event or a date that he remembers well. And then going back to what I stated earlier, our position is the heart of the claim is really the forced abortion and the fact the petitioner moved his family to the island in order to have two more children in violation of the policy. But the sterilization notice is part and parcel of the Chinese government's suppression of children being born. Isn't that part of their program there? It is. Why doesn't that then go to the heart of the matter of a person who's claiming political persecution because of the suppression of children policy? Abortion is just one feature of it. Sterilization is another. Yes, but the fact that the petitioner could not remember the exact date of the notice is not that surprising. If you look at his education level, he received up to junior high education, I believe. You know, people without a lot of education can have magnificent memories. So that really is not a very good fact. I have folks in my family who didn't get beyond grammar school level of education and wonderful memories, which isn't saying a lot, but anyway. This petitioner, if you look at his testimony, I think it's very clear that he doesn't have an excellent memory. And the notice is, you know, a piece of paper that his aunt gave him at some point in time. You know something, your position would be a lot stronger if they were niggling at him about, oh, well, you said it was June 1st and it turns out it was September 1st. Ten years is a pretty long piece of most people's lives, I think. I understand. And also, I mean, if you look at the testimony in the record, 10 years is basically a guess after the petitioner stated that he can't remember. And he may have been under pressure. He was being told by the immigration judge to come up with a date or at least a decade. He was off. Let me go to another issue. Are you abandoning any claim that your client was being persecuted either because of his political position or because he was a member of a particular social group? No, Your Honor. I was going to turn to that issue next. We did not raise the particular social group issue in this case. We are not abandoning our arguments that the retaliation against Petitioner by the smugglers or snakeheads who he helped prosecute as a material witness. Well, I believe you checked off the box particular social group in the application for asylum, or at least Mr. Bauer did. Yes. And I don't mean to push you into a corner on this, but we recently granted an in-bank hearing in a case called Enriquez-Rivas in which we may revisit the particular social group category. But I take it that is not part of your briefing and is therefore not to be considered here. Your Honor, I did not raise that issue. In this case, the box is checked. I don't believe any of the attorneys before me who represented Petitioner before the immigration judge raised the issue other than checking the box. Let me ask you another question, because we have pretty good jurisprudence on the political nexus issue. Wasn't this a case where the U.S. attorney wrote a letter? Yes, Your Honor. The U.S. attorney wrote a letter recommending that Petitioner be allowed to remain in this country indefinitely because U.S. attorney believed that if he was returned to China, he would be in danger from the people who the U.S. attorney prosecuted, the smugglers. Is it any part of your case that the U.S. attorney did not accurately relate his understanding with your client for purposes of testimony and that he actually promised him that he could stay here? Well, the letter is more of a recommendation. We would argue that the letter is compelling evidence that the Petitioner would be persecuted on account of imputed political opinion were he to be returned to China. Ling v. INS and Briones v. INS show that retaliation against informers can be on account of imputed political opinion and not merely personal revenge. Here the agency erroneously concluded that the smuggling organization must be a political organization for asylum protections. This Court's recent opinion, Antonin v. Holder, extends asylum to Petitioners facing persecution from criminals who are protected by corrupt government officials in their countries. We would submit that that's exactly the case here and exactly what the U.S. attorney warns against in his letter. You know, what's interesting partly about that is, on the one hand, the argument is that, well, he'll be protected by the political – the snakeheads will be protected by the political powers in China because they're corrupt. On the other hand, I think I saw him – something in his papers arguing that he'll be persecuted by the political people in China because they will think he's a snakehead. So on the one hand, they protect the smugglers, and on the other hand, they're going to on the basis that he's a smuggler. Those seem like somewhat antithetical positions. I disagree with that, Your Honor. I think they're actually consistent. If you think about it, the Petitioner is afraid that smugglers against whom he served as a material witness are powerful criminals and that they'll be – they'll have influence over the Chinese government officials. At the same time, the Petitioner isn't a powerful criminal with any influence over the Chinese government, and he's afraid that he'll be wrongly accused of being a smuggler if he's returned to China. If you look at the country condition reports in the record, his position is consistent with those reports. Well, I think the difference between Antonin and our case – and maybe there isn't a difference and you can go into it. In Antonin, you had a corrupt level of Armenian government protecting the criminal who had threatened Antonin. Here, what is the evidence of any crooked ties between the snakeheads and the Chinese government? I mean, the most you say is that the snakeheads are not prosecuted by the Chinese government, but none of – there's no allegation that the Chinese government is protecting and fostering the snakeheads' activities. Well, there is the evidence of the U.S. Attorney's letter saying that, you know, the Petitioner and the other witnesses in the case are not going to be protected by the Chinese government if they're returned to China. And that's powerful evidence. That's written by a U.S. attorney who prosecuted the smuggling case and probably knows the case better than anyone else. But does he know China better than anybody else? It seems to me he's not given us much, at least in the letter, that indicates that he's an expert on what's going to happen in China, I don't believe. If you look at the country condition reports in the record, they indicate the Chinese government in the Fujian province commonly makes examples of deportees with public floggings and beatings. Counsel, Judge Gould, if I could interject a question, please. I was concerned with some of the issues that are raised by my colleagues. What evidence is there in the record that shows that the Chinese government would not Yes, Your Honor, I believe the evidence is the letter from the assistant U.S. attorney and then also the country condition reports which detail a very But I didn't see anything in the country condition reports that said the government won't stand up to snake heads. Not exactly, but they do detail a very corrupt criminal justice system, and Petitioner would be placed in a very bad position if he's put into that system. Your Honors, if I may, I deserve my remaining time for rebuttal. I see I'm running out of time. If I may, Mr. Chateau. If I may please the Court, Eric Marsteller for the Attorney General. There are two main issues in this Court. One is the Court's jurisdiction over the alien crew member case, and the second is Mr. Nguyen's eligibility for relief from protection. I'll begin with the jurisdiction briefly. We believe that because the denial of asylum in these asylum-only proceedings is the functional equivalent of a removal order, the Court has jurisdiction to hear these proceedings. I could go into more if the Court's interested, but I'll move on to the other issues. I'll begin with the credibility claim. The record does not compel the conclusion that Mr. Nguyen established his credibility regarding his claim based on a fear of the Chinese course of population control policy. The discrepancies between his testimony and the documentary evidence are substantial. There's a 10-year gap, and not only is it a large time, but the circumstances of his life were very different when he testified that he received the claims in 86 or 87 versus when they were actually received, which was their date of 95 and 97. Again, he also, during his testimony. Tell me what you mean by that, the circumstances of his life were different. Well, at the time, during his initial testimony, he testified that he received the sterilization letters, and he said he wasn't exactly sure, but he guessed 1986. He gave further indicia of reliability explaining why he thought that it was about one year after his wife's abortion, he testified at one point. But anyway, in 1986, when he testified he received them, he was still presumably living in Fujian province. He only had one child, and in 1995 and 1997, when it appears he actually received them, he was living in Tangyu Island. He had, by that time, had three children. So it just goes to the chronology of the events of his claim, and it seems that precise year when he would have received the documents, it was reasonable to expect that he would have had a better sense of approximately when in the chronology of his life they would have appeared. Help me on something I can't remember. The sterilization letter, did it say that his wife would be sterilized or that he would be sterilized? It said that he was scheduled to have an appointment for sterilization, and I And if he had received that in 1985, it would be when he and his wife had already had one child. Right. And according to him, his wife had been forced to have an abortion. That's correct. So that would be an enforcement of the one-child policy. Assuming that's credible, yes. So how would that be different from receiving it in 1995 or 1997 when he had three children? Well, it doesn't go to the validity of his claim. It more goes to the believability of it. If his claim was accurate and he received this in 1986, it's possible that he would be able to meet his burden. But here the issue is credibility. It's not whether one version is true or the other is true. If either version was true, he might have a claim. But the fact of the matter is the discrepancy in his story is so substantial that the board reasonably relied on it in finding him not credible. In these cases, we have aliens coming from overseas with little documentary evidence, and it's based mostly on their testimony. And the agency's responsibility is trying to determine not only if the claim that they're giving is recognizable under the statute, but also whether it's believable. And here the substantial discrepancy made it seem not believable to them. Mr. Marstall, what other contradiction or inconsistency was developed at the hearing to bottom a finding that he was not credible? Well, I'm going to focus just on the population control policy claim, because the board didn't address credibility with regard to the other claim. That was the only inconsistency directly cited by the board in its decision. So we think that's really enough. That discrepancy in itself was enough to support the board decision. And the record evidence does not, we don't believe, compel a contrary conclusion that he was credible. Counsel, if I could interject on that. The standard is if we reject the adverse credibility, we would have to say that the record compels a conclusion that he was credible, right? That's correct, Your Honor. So you'd have to compel the conclusion that he was credible, and then if the court were to reach that determination, it would need to remand the case for the proceedings in light of a change in the law since then. Mr. Nyon in his brief argues that he would be per se eligible for asylum based on his wife's abortion. The law has changed since the briefing in this case was done and before the board conducted it. So now there's no per se eligibility based on the abortion of a spouse, but he could potentially seek relief based on showing other resistance to China's population control policy. But, again, that's an issue that the board would need to reach only if the court found the record compelled the conclusion that he was credible. Counsel, if we could turn to the snakehead issue first. Yes, Your Honor. One moment. Why should we strain a lot to review country reports and assess whether he would be subjected to retaliation by the snakeheads in China if the U.S. attorney writes a letter saying that that's likely? And why shouldn't we be able to rely on a U.S. attorney? Well, Your Honor, the issue here is what the board relied on. And the letter was written by an assistant U.S. attorney who helped prosecute the snakeheads where Mr. Nyon was a cooperating witness. The board, upon remand, took a close look at the letter and all it was required to do was give full consideration to the letter. And the letter, which was written in 1999, the board found that the subsequent lack of any additional hardships facing Mr. Nyon or his family, that evidence kind of outweighed the claims made in the letter. The board noted that the letter was apparently based on the – first off, it was apparently written for multiple cooperating witnesses with just the name changed. And that kind of goes to show that it was more of a form letter given to all the cooperating witnesses, not necessarily written specifically for Mr. Nyon. It also seems to base its claims on the fact that some of the family members of some of the cooperating witnesses were threatened and harmed in China at the time that their family members were witnesses in 1998 and 1999. Here, Mr. Nyon was never – his family was never subject to any harm on account of his being a witness in the criminal prosecution. So – and then finally, the board looked at the fact that – the board was making its decision in 2007 and it was looking at the fact that nothing had happened between 1999 and 2007. So the AUSA letter indicated that his family would be at risk and he would be at risk of harm based on his being a cooperating witness. But in the intervening eight years, nothing happened. And so the board looked at that absence of evidence and concluded that it outweighed the concerns raised by the AUSA in the letter. Additionally, the AUSA letter really – we believe it is only really relevant to the claim for torture convention relief. We don't believe that Mr. Nyon can meet his burden for meeting his eligibility for asylum or holding of removal because he hasn't established a nexus to a protected ground. He hasn't shown that any harm by the snakeheads would be on account of his political opinion. So we believe that the only issue where the AUSA letter is really relevant is with the torture convention relief. And to meet the standard there, he had to show before the agency that it was more likely than not that he would be subject to torture if he was returned to China. So the fact that there was no evidence, the board found made it – they found that he had not met his burden of showing that it was clearly probable that he would be subject to torture if he returned to China. That doesn't even begin to get into the issue of whether the Chinese government would acquiesce to such torture. And the board found that Mr. Nyon had not met his burden of showing that the Chinese government would be willfully blind or acquiesce to torture by the snakeheads. And we do not believe that the record compels a contrary conclusion. One second, Your Honor. I believe those were the main issues we wanted to present to you all. If there are no further questions, the government will rest on its briefs. Thank you. I have no questions. Very briefly, Your Honors, just three points. One is that Mr. Nyon did testify that his family was beaten up by unknown individuals during the time that he was detained, originally as a defendant and then as a material witness in the case. He also testified that he received a death threat from the main smuggler or snakehead. And finally, we would submit the fact that the letter was written from multiple defendants strengthens, not weakens, the letter. It shows that there were more people than just the petitioner who held this fear that if they were returned after being witnesses in this case, the Chinese government wouldn't protect them from the smugglers or the snakeheads in China. And we would ask that the court follow the recommendations made by the assistant U.S. attorney and find that Mr. Nyon's feared future persecution would be on account of imputed political opinion. Is it part of your case that the BIA did not follow the mandate in the earlier case and did not thoroughly consider the AUSA's letter? No. I think it was the court remanded the case specifically for the BIA to consider the letter, and they did consider it in the second decision. So we're not. Okay. Thank you very much. Thank you. The case of Bao Nyon v. Eric Holder will be submitted, and we shall go to the next case on the argument calendar, which is Janet Mays v. Q. West Corporation. Ashley. Thank you.
judges: Fernandez, Gould, Bea